[No. S112624. Dec. 23, 2004.]

LEWIS JORGE CONSTRUCTION MANAGEMENT, INC., Plaintiff and Respondent, v.
POMONA UNIFIED SCHOOL DISTRICT et al., Defendants and Appellants.

## COUNSEL

Horvitz & Levy, Mitchell C. Tilner, John A. Taylor, Jr.; Best, Best & Krieger, Howard B. Golds and Piero C. Dallarda for Defendants and Appellants.

Atkinson, Andelson, Loya, Ruud & Romo, Terry T. Tao and Joseph J. Huprich for Education Legal Alliance of the California School Boards Association as Amicus Curiae on behalf of Defendants and Appellants.

Orbach & Huff, David M. Huff and Sima R. Salek for Coalition for Adequate School Housing as Amicus Curiae on behalf of Defendants and Appellants.

Case, Ibrahim & Clauss, F. Albert Ibrahim; Snell & Wilmer, Richard A. Derevan and Marc L. Turman for Plaintiff and Respondent.

Gordon & Rees and Thorsten J. Pray for Associated General Contractors of California as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—A school district terminates a construction contract when the contractor, four and a half months after the promised due date, still has not finished the project. The contractor's bonding company then hires another firm to complete the project, but it suspends then later reduces the amount of bonding for the contractor. The latter successfully sues the school district for breach of contract, recovering in damages some $3 million for potentially lost profits, which the contractor claimed it would have earned on prospective construction contracts it never won because of its impaired bonding capacity. The Court of Appeal concluded that those potential profits were a proper item of general damages in this action for breach of contract. We disagree.

### I.

In 1994, the Pomona Unified School District (District) solicited bids for building improvements at Vejar Elementary School. The District awarded the contract to Lewis Jorge Construction Management, Inc. (Lewis Jorge), the low bidder at $6,029,000. Although the contract originally provided for completion in December of 1995, heavy rains delayed work, and the parties agreed to a revised completion date of January 22, 1996. That date came and went, but the project remained unfinished.

The District withheld payments to Lewis Jorge for work completed in April and May, 1996. On June 5, the District terminated the contract with Lewis Jorge and made a demand on the contractor's surety to finish the project under the performance bond the surety had provided for Lewis Jorge. The surety then hired another contractor to complete the school project for $164,000. That contractor completed the project between early July and mid-September, 1996.

Lewis Jorge sued the District, alleging it breached the contract by declaring Lewis Jorge in default and terminating it from the construction project. The complaint sought damages and alleged six causes of action. The first, alleging breach of contract, and the second, alleging breach of an implied warranty of sufficiency of the plans and specifications for the project, are both contractual claims naming the District as a defendant. Causes of action three through five—alleging nondisclosure of material facts, inducing breach of contract, and negligence—named a district employee as a defendant. The sixth cause of action sought equitable indemnity against both the District and the employee for claims against Lewis Jorge by its surety and its unpaid subcontractors. Lewis Jorge did not plead as special damages the profits it claimed to have lost on future contracts.

Lewis Jorge, in turn, was sued by a number of its subcontractors for nonpayment of their past due bills.

At trial, Lewis Jorge presented evidence from its bonding agent that in June 1996 it had a bonding limit of $10 million per project, with an aggregate limit of $30 million for all work in progress. By mid-1997, the only sureties willing to provide Lewis Jorge with bonding imposed a limit of $5 million per project, with an aggregate limit of $15 million, a reduction of its bonding capacity to the level its surety had imposed in the early 1990's. Sometime in 1998, Lewis Jorge ceased bidding altogether and eventually closed down.

Lewis Jorge sought to prove the extent of its lost future profits on unidentified construction projects, using as the relevant period the date of the District's breach to the date of trial, and relying on its profitability during the four years preceding the breach. Robert Knudsen, a financial analyst who specialized in calculating lost profits claims, projected that Lewis Jorge had lost $95 million in gross revenue for future contracts that, based on its past history, it would likely have been awarded. Historically, Lewis Jorge had realized a profit of about 6 percent of revenue. Knudsen calculated lost profits on unidentified projects at $4,500,000, which discounted to present value came to $3,148,107.

The jury returned special verdicts in favor of Lewis Jorge, finding the District liable for $362,671 owed on the school construction contract, of which $143,755 was attributable to the District's "breach of warranty as to the fitness of its plans or specification" (the complaint's second cause of action). It awarded $3,148,197[1] in profits Lewis Jorge did not realize "due to the loss or reduction of its bonding capacity." Having found the District's employee negligent, the jury found him and the District jointly and severally liable for $3,510,868.

The District and its employee appealed. Lewis Jorge also appealed, raising issues that are not material here and were rejected by the Court of Appeal. Although the Court of Appeal reversed the judgment against the District's employee, and reversed awards against the District for prejudgment interest and contractual attorney fees (Civ. Code, § 1717), it rejected the District's claim that the award to Lewis Jorge of $3,148,197 for potential profits on future projects was an improper component of *general damages* for breach of contract. The Court of Appeal granted the District's petition for rehearing on that question; after receiving additional briefing, it concluded that "the lost profit damages sought by Lewis Jorge were in the nature of general damages, [] not special damages as claimed by the District."

We granted the District's petition for review to resolve whether general damages for breach of a construction contract include potential profits lost on future contracts that a contractor does not win when, as a consequence of the property owner's breach, the contractor's surety reduces the contractor's bonding capacity.[2] We later solicited and received briefing from the parties on the related issue of whether an award of lost potential profits would have been proper here as special damages.

## II.

■　Damages awarded to an injured party for breach of contract "seek to approximate the agreed-upon performance." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515 [28 Cal.Rptr.2d 475, 869 P.2d 454] (*Applied*).) The goal is to put the plaintiff "in as good a position as he or she would have occupied" if the defendant had not breached the contract. (24 Williston on Contracts (4th ed. 2002) § 64:1, p. 7.) In other

---

[1] The jury returned an award some $90 greater than the lost profit sum calculated by expert witness Knudsen.

[2] The District does not challenge either the jury's finding that the District breached the contract or its award of $362,671 in general damages for the breach.

words, the plaintiff is entitled to damages that are equivalent to the benefit of the plaintiff's contractual bargain. (*Id.* at pp. 9–10; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 813, pp. 732–733; *Peterson v. Larquier* (1927) 84 Cal.App. 174, 179 [257 P. 873] [breach of lease permits injured party to recover difference between rental value at date of breach and rent specified in lease for its term].)

■ The injured party's damages cannot, however, exceed what it would have received if the contract had been fully performed on both sides. (Civ. Code, § 3358.) This limitation of damages for breach of a contract "serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." (*Applied, supra,* 7 Cal.4th at p. 515.)

■ Contractual damages are of two types—general damages (sometimes called direct damages) and special damages (sometimes called consequential damages). (24 Williston on Contracts, *supra,* § 64.1, pp. 11–12; 3 Dobbs, Law of Remedies (2d ed. 1993) § 12.2(3), pp. 39–42; see, e.g., *Erlich v. Menezes* (1999) 21 Cal.4th 543, 558 [87 Cal.Rptr.2d 886, 981 P.2d 978].)

A. *General Damages*

■ General damages are often characterized as those that flow directly and necessarily from a breach of contract, or that are a natural result of a breach. (Civ. Code, § 3300 [damages "which, in the ordinary course of things, would be likely to result" from breach]; *Mitchell v. Clarke* (1886) 71 Cal. 163, 167–168 [11 P. 882] [general damages are those that naturally and necessarily result from breach].) Because general damages are a natural and necessary consequence of a contract breach, they are often said to be within the contemplation of the parties, meaning that because their occurrence is sufficiently predictable the parties at the time of contracting are "deemed" to have contemplated them. (Calamari & Perillo, The Law of Contracts (2d ed. 1977) § 14-5, p. 525; *Hunt Bros. Co. v. San Lorenzo Water Co.* (1906) 150 Cal. 51, 56 [87 P. 1093] [parties need not "actually have contemplated the very consequence that occurred," but they would have supposed such a consequence was likely to follow a breach].)

B. *Special Damages*

■ Unlike general damages, special damages are those losses that do not arise directly and inevitably from any similar breach of any similar agreement. Instead, they are secondary or derivative losses arising from circumstances that are particular to the contract or to the parties. Special damages are recoverable if the special or particular circumstances from which they

arise were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test). (*Mitchell v. Clarke, supra,* 71 Cal. at pp. 164–167; 1 Witkin, Summary of Cal. Law, *supra,* § 815, p. 733.) Special damages "will not be presumed from the mere breach" but represent loss that "occurred by reason of injuries following from" the breach. (*Mitchell v. Clarke, supra,* 71 Cal. at p. 168.) Special damages are among the losses that are foreseeable and proximately caused by the breach of a contract. (Civ. Code, § 3300.)

California follows the common law rule that an English court articulated some 150 years ago in *Hadley v. Baxendale* (1854) 156 Eng.Rep. 145. After Hadley's mill shut down because of a broken crankshaft, he entered into a contract to have a new one built. When the builder asked Hadley to send him the broken shaft to use as a model, Hadley took it to Baxendale, a common carrier, for delivery to the builder. Baxendale did not deliver until seven days later. Hadley then sued Baxendale for lost profits for that period. Hadley's lost profits, the court held, were not recoverable, because he had failed to inform the carrier that the mill would be shut down until delivery of the new shaft. (*Id.* at p. 151.) Because the special circumstance—the mill's inoperability without a mill shaft—was not communicated to Baxendale, he did not assume the risk of compensating Hadley for mill profits lost as a resulting of Baxendale's late delivery of the mill shaft.

*Hadley* did not expressly distinguish between general and special damages. But such a distinction flows naturally from that case; hence the rule that a party assumes the risk of special damages liability for unusual losses arising from special circumstances only if it was "advised of the facts concerning special harm which might result" from breach—it is not deemed to have assumed such additional risk, however, simply by entering into the contract. (1 Witkin, Summary of Cal. Law, *supra,* § 815, p. 733; See *Mitchell v. Clarke, supra,* 71 Cal. at pp. 165–169.)

The *Hadley* rule has long been applied by California courts, which view it as having been incorporated into California Civil Code section 3300's definition of the damages available for breach of a contract. (*Hunt Bros. Co. v. San Lorenzo Water Co., supra,* 150 Cal. at p. 56; *Christensen v. Slawter* (1959) 173 Cal.App.2d 325, 334 [343 P.2d 341]; *Sabraw v. Kaplan* (1962) 211 Cal.App.2d 224, 227 [27 Cal.Rptr. 81].) Contract damages, unlike damages in tort (Civ. Code, § 3333), do not permit recovery for unanticipated injury. (*Hunt Bros. Co. v. San Lorenzo Water Co., supra,* 150 Cal. at p. 56.)

Parties may voluntarily assume the risk of liability for unusual losses, but to do so they must be told, at the time the contract is made, of any special harm likely to result from a breach (*Mendoyoma, Inc. v. County of Mendocino* (1970) 8 Cal.App.3d 873, 879–880 [87 Cal.Rptr. 740]; see *Erlich v. Menezes, supra,* 21 Cal.4th 543, 558–560; *Brandon & Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 455–456 [277 Cal.Rptr. 40]). Alternatively, the nature of the contract or the circumstances in which it is made may compel the inference that the defendant should have contemplated the fact that such a loss would be "the probable result" of the defendant's breach. (*Burnett & Doty Development Co. v. Phillips* (1978) 84 Cal.App.3d 384 [148 Cal.Rptr. 569] [the defendant's delay in preparing site for subdivision breached contract with developer and subjected the defendant to liability for profits that developer could not earn on unbuilt houses].) Not recoverable as special damages are those "beyond the expectations of the parties." (*Applied, supra,* 7 Cal.4th at p. 515.) Special damages for breach of contract are limited to losses that were either actually foreseen (see, e.g., *Dallman Co. v. Southern Heater Co.* (1968) 262 Cal.App.2d 582, 586 [68 Cal.Rptr. 873] [in contract negotiations, supplier was put on notice that its failure to perform would result in lost profits]) or were "reasonably foreseeable" when the contract was formed. (*Applied,* at p. 515.)

## III.

Here, the Court of Appeal affirmed the jury's award to Lewis Jorge of $3,148,197 in *general damages,* based on profits Lewis Jorge did not earn on future unidentified contracts because its surety had reduced its bonding capacity after the District's termination of the construction contract. The Court of Appeal concluded that such potential profits were recoverable as general damages because they followed "from the breach in the ordinary course of events" and were a "natural and probable consequence." The Court of Appeal found it significant, as did the trial court, that the contract at issue, like much of Lewis Jorge's business, was a public contract that required bonding.

The Court of Appeal reasoned: When the contract was formed, the District knew of its own bond requirements, and it knew that public works contractors must provide bonds to secure their performance. Because impaired bonding capacity "has long been recognized as a direct consequence of an owner's breach of a construction contract," the Court of Appeal concluded that the District should have known that breaching the contract and resorting to the surety to complete the project could impair Lewis Jorge's ability to obtain bonds without which it could not bid on other public contracts. Accordingly,

the Court of Appeal held that the potential profits Lewis Jorge lost on contracts it did not win after the District's termination of the school construction contract were general damages attributable to the District's breach.[3]

The Court of Appeal, however, failed to consider a threshold inquiry. If the purpose of contractual damages is to give the nonbreaching party the benefit of its contractual bargain, then the first question is: What performance did the parties bargain for? General damages for breach of a contract "are based on the value of the performance itself, not on the value of some consequence that performance may produce." (3 Dobbs, Law of Remedies, *supra*, § 12.4(1), p. 62.) Profits " 'which are the direct and immediate fruits of the contract' " are " 'part and parcel of the contract itself, entering into and constituting a portion of its very elements; something stipulated for, the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation.' " (*Shoemaker v. Acker* (1897) 116 Cal. 239, 245 [48 P. 62].)

Unearned profits can sometimes be used as the measure of general damages for breach of contract. Damages measured by lost profits have been upheld for breach of a construction contract when the breaching party's conduct prevented the other side from undertaking performance. (*Stark v. Shaw* (1957) 155 Cal.App.2d 171, 181 [317 P.2d 182] [contractor's delay in building subdivision prevented roofing subcontractor from performing]; *De Flavio v. Estell* (1959) 173 Cal.App.2d 226, 232–233 [343 P.2d 150] [lost profit damages below contractor's estimated profit upheld when owner repudiated contract].) The profits involved in *Stark* and *De Flavio,* however, were purely profits unearned on the very contract that was breached.

Lost profits from collateral transactions as a measure of general damages for breach of contract typically arise when the contract involves crops, goods intended for resale, or an agreement creating an exclusive sales

---

[3] The District advances various public policy arguments in urging us to preclude lost future profits as a component of general damages when the hiring party is a public entity and especially when, as here, it is a school district. Lewis Jorge responds that because public contracts require bonding, profits lost on potential projects because of impaired bonding capacity after an owner's breach of a public contract will always be general damages. Whatever the merits of these arguments, we need not base our holding on the circumstance that the contract was a public contract or that a public school district was the breaching party. For bonding, although it is statutorily required for most public contracts, is also commonly imposed under contracts between private parties for larger construction projects. (See, e.g., *Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 35, 40 [86 Cal.Rptr.2d 855, 980 P.2d 407] [condominium developer required contractor to furnish a labor and materials payment bond and a performance bond for the full $3.9 million contract price]; 1 Cal. Construction Contracts and Disputes (Cont.Ed.Bar 3d ed. 2003) Drafting Construction Contracts, § 2.9, p. 82 ["owner should also reserve the right to require bidders to furnish performance and payment bonds"].)

agency. (*Nelson v. Reisner* (1958) 51 Cal.2d 161, 170–171 [331 P.2d 17] [lessor's breach of lease precluded sharecropping farmer from raising crops and realizing profit on their sale]; *Morello v. Growers Grape Prod. Assn.* (1947) 82 Cal.App.2d 365 [186 P.2d 463] [disappointed purchaser of brandy who intended to bottle and resell it]; *Brunvold v. Johnson* (1939) 36 Cal.App.2d 226 [97 P.2d 489] [termination of exclusive agent for sale of rope and twine products]; *Tahoe Ice Co. v. Union Ice Co.* (1895) 109 Cal. 242 [41 P. 1020] [termination of supply contract by ice retailer]; *Grupe v. Glick* (1945) 26 Cal.2d 680 [160 P.2d 832] [defective oil refining machines purchased for resale by exclusive agent]; see also *Brandon & Tibbs v. George Kevorkian Accountancy Corp., supra,* 226 Cal.App.3d at p. 457 [where parties conceded that lost profits were the measure of damages for breach, the breach of a joint venture to expand accounting practice by acquiring an existing practice in another city supported an award of unearned profits as component of general damages for breach of contract].) The likelihood of lost profits from related or derivative transactions is so obvious in these situations that the breaching party must be deemed to have contemplated them at the inception of the contract.

We are not aware of any California authority involving a construction contract that has upheld an award of general damages against a breaching owner for profits unearned on unidentified contracts the contractor did not get when its bonding was impaired as a result of the contract breach. Lewis Jorge, nevertheless, urges us to permit such recovery, citing a Montana decision, *Laas v. Mont. Hwy. Comm'n et al* (1971) 157 Mont. 121 [483 P.2d 699]. In that case the plaintiff highway contractor, who had been in business for 22 years and had made a profit on *every* construction project, claimed three years of profits lost or $250,000 for projects he was unable to win when his bonding capacity was reduced after the state breached the construction contract. The Montana Supreme Court affirmed a jury award of $78,000 in lost profits. (*Id.* at p. 130.) It did so without reference to the construction context, by simply applying rules for profits lost to an established business. But five years later, in *Zook Brothers Constr. Co. v. State* (1976) 171 Mont. 64 [556 P.2d 911], another case involving breach of a highway construction contract, the same court disallowed recovery of profits lost on other projects after the state's breach. The Montana court found "vague and speculative" future profits the contractor did not earn when the state's breach caused him financial woes, forcing him to sell equipment without which he was unable to take on additional work. (*Id.* at p. 76.) The Montana court's earlier decision in *Laas* appears to represent a singular instance of upholding lost profits on future construction projects as an item of general damages for breach of a construction contract, a holding that has not been followed in a published opinion outside Montana in the 33 years it has been on the books.

The only California decision upholding damages for a contractor's lost profits on future contracts it did not win because its bonding capacity was impaired arises not, as here, from a construction contract but from a contract to provide future bonding. (*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 489 [54 Cal.Rptr.2d 888].) The parties to the breached contract in *Arntz* were the contractor and its surety, which agreed to provide the contractor with ongoing bonding. (*Id.* at p. 473.) Because the contract was one for future bonding, it was entirely within the contemplation of the surety that its breach of the contract—resulting in the contractor's loss of actual bonding—would preclude the contractor from bidding on and being awarded major projects. Thus, the loss of profits on those projects were properly general damages, for they were the "direct and immediate fruits" (*Shoemaker v. Acker, supra,* 116 Cal. at p. 245) of the surety's breach of the contract to provide bonding.

Applying these rules to the school construction contract here, we cannot say that the parties' bargain included Lewis Jorge's potential profits on future construction projects it had not bid on and been awarded. Full performance by the District would have provided Lewis Jorge with full payment of the contract price. Certainly, Lewis Jorge anticipated earning a profit on the school contract with the District, but that projected profit was limited by the contract price and Lewis Jorge's costs of performance. If Lewis Jorge's bid accurately predicted its costs, the benefit of its contractual bargain for profits was capped by whatever net profit it had assumed in setting its bid price.

The District's termination of the school contract did not directly or necessarily cause Lewis Jorge's loss of potential profits on future contracts. Such loss resulted from the decision of CNA, Lewis Jorge's surety at the time of the breach, to cease bonding Lewis Jorge.

Contrary to Lewis Jorge's contention, our decision in *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285 [85 Cal.Rptr. 444, 466 P.2d 996] does not compel a different result. There, a contractor sued the city for breach of a contract to construct a retaining wall. The complaint alleged four causes of action. As relevant here, the third cause of action alleged that the city had breached the contract by refusing to issue a "change order" to compensate the contractor for additional costs when soil at the site proved to be more unstable than city test holes had revealed, requiring the contractor to use special, more expensive casting methods, which did not comply with the contract's specifications. (*Id.* at p. 290.) The fourth cause of action alleged

that the city provided misleading results of two test holes it had drilled and did not disclose earlier landslides on the site. (*Id.* at pp. 290–291.) The jury returned a general verdict for $150,000 against the city. (*Id.* at pp. 289, 300, fn. 18.)

Of the $150,000 awarded by the jury in *Warner,* we upheld only $81,743.55 in damages.[4] (*Warner Constr. Corp. v. City of Los Angeles, supra,* 2 Cal.3d at pp. 301, 303.) The city had challenged the $150,000 award on the ground that it included "compensation for speculative and unproven items of damages." (*Id.* at p. 300.) The plaintiff, relying on evidence that it had suffered impairment of capital when it funded added construction costs out of pocket, argued that it was entitled to the entire $150,000 award because of its uncompensated losses, including profits it did not earn after the city's breach. This court rejected the contention that lost profits would necessarily be speculative "[f]or an established firm such as Warner." (*Id.* at p. 301.) We went on to state that "[l]oss of business, restriction of research, reduction of bonding capacity, and destruction of a former advantageous competitive position comprise imponderable factors which may affect different companies to differing extents and amounts." (*Ibid.*) The measure of such damages, we said, "requires proof of the effect of these factors" on the plaintiff's profits. (*Ibid.*) *Warner* did not reach the merits of the contractor's lost profits claim, however, because it concluded that the contractor had failed to prove lost profits, and therefore any award for lost profits could not "be sustained." (*Ibid.*)

*Warner* did *not* hold that potential profits lost from future contracts are general damages that naturally flow from a breach of a construction contract. At most, it acknowledged that to recover profits lost on future contracts the plaintiff contractor must prove their occurrence and extent. (*Warner Constr. Corp. v. City of Los Angeles, supra,* 2 Cal.3d at pp. 301–302.) Indeed, the two lost profits cases cited by *Warner* are instructive, and we briefly discuss them below.

The first, *Lucky Auto Supply v. Turner* (1966) 244 Cal.App.2d 872 [53 Cal.Rptr. 628], concerned a claim of trespass, a *tort,* for which the measure of damages is broader than for breach of a contract. (See Civ. Code, § 3333 ["all the detriment proximately caused" whether or not it could have been "anticipated"]; *Lucky Auto Supply,* at pp. 881–882.)

The second case, *Dallman Co. v. Southern Heater Co.* (1968) 262 Cal.App.2d 582 [68 Cal.Rptr. 873], involved profits lost by a plumbing

---

[4] Although the complaint in *Warner* framed the fourth cause of action as one for fraudulent concealment, which is a tort, this court treated the claim as an action in contract for breach of warranty. (*Warner Constr. Corp. v. City of Los Angeles, supra,* 2 Cal.3d at p. 294 & fn. 4.)

distributor when the supplier of its private-label water heaters breached a contract for providing a ready supply of heaters and spare parts. (*Id.* at pp. 591–592.) The Court of Appeal upheld an award of lost profits because the plaintiff had specifically informed the defendant that it would suffer losses if new heaters and parts would not be readily available. (*Id.* at p. 586.) In other words, the lost profits claim there met the rule of *Hadley v. Baxendale, supra,* 156 Eng. Rep. 145, allowing damages flowing from unusual circumstances communicated to the breaching party when the contract was formed.

 Having here concluded that profits Lewis Jorge might have earned on future construction projects were improperly awarded as general damages, we now decide whether those lost potential profits were recoverable as special damages. Lost profits, if recoverable, are more commonly special rather than general damages (3 Dobbs, Law of Remedies, *supra,* § 12.4(3), pp. 76–77), and subject to various limitations. Not only must such damages be pled with particularity (*Mitchell v. Clarke, supra,* 71 Cal. at p. 164), but they must also be proven to be certain both as to their occurrence and their extent, albeit not with "mathematical precision." (*Berge v. International Harvester Co.* (1983) 142 Cal.App.3d 152, 161 [190 Cal.Rptr. 815]; accord, *Grupe v. Glick, supra,* 26 Cal.2d at pp. 692–693; *Resort Video, Ltd. v. Laser Video, Inc.* (1995) 35 Cal.App.4th 1679, 1698–1700 [42 Cal.Rptr.2d 136].) "When the contractor's claim is extended to profits allegedly lost on *other* jobs because of the defendant's breach" that "claim is clearly a claim for special damages." (3 Dobbs, Law of Remedies, *supra,* § 12.4(3), fn. 12, p. 71.) Although Lewis Jorge did not plead its lost future profits as special damages, the issue of their availability as special damages was presented to the jury, and at oral argument the District expressly stated that it was not relying on that pleading omission.

Although a few cases state that a contractor suing for breach of contract may recover as special damages any profits it might have earned on other unawarded construction contracts, such damages are frequently denied as too speculative. (See, e.g., *Hirsch Elec. Co., Inc. v. Community Services, Inc.* (1988) 145 A.D.2d 603, 605 [536 N.Y.S.2d 141, 143] [contractor's claim that breach rendered it unable to obtain bonding, without which it could not bid or win another contract on which it would have made a profit of $800,000, was rejected as consisting of "inferences piled upon inferences" that "as a matter of law, are too speculative to give rise to the recovery of damages for lost profits"]; *Manshul Constr. Corp. v. Dormitory Auth. of N.Y.* (1981) 111 Misc.2d 209 [444 N.Y.S.2d 792, 803–804].) And there are federal decisions that likewise have rejected as too remote and speculative special damages for breach consisting of profits lost on other contracts. As one circuit court explained, "even in a common-law suit there would be no recovery for general loss of business, the claimed loss of [the contractor's entire] net worth, and losses on the non-federal work—such damages are all deemed too

remote." (*William Green Construction Co., Inc. v. United States* (1973) 201 Ct.Cl. 616 [477 F.2d 930, 936]; accord, *Olin Jones Sand Company v. United States* (1980) 225 Ct.Cl. 741 [failure of government to make timely progress payments to contractor caused it loss of standing in the business community and occasioned denial of bonding on other contracts; lost profits on such contracts too remote and indirect]; *Rocky Mountain Constr. Co. v. United States* (1978) 218 Ct.Cl. 665, 666 ["wholly conjectural" whether the plaintiff contractor would have received other contracts; such speculative and remote damages not compensable as a matter of law].) These cases bar recovery of profits lost on future contracts not because the amount of the lost profits is speculative or remote, but because their occurrence is uncertain. (*Continental Car-Na-Var Corporation v. Moseley* (1944) 24 Cal.2d 104, 113 [148 P.2d 9]; see 1 Dunn, Recovery of Damages for Lost Profits (5th ed. 1998.) § 1.6, p. 17; 2 Bruner and O'Connor, Construction Law (2002) § 7:173, p. 945 [an impaired bonding claim is a lost business claim with the added requirement that the plaintiff must prove that the breach of contract caused the impairment of bonding capacity].)

California, likewise, has not upheld as special damages a contractor's unearned profits after breach of the construction contract. In *S.C. Anderson v. Bank of America* (1994) 24 Cal.App.4th 529 [30 Cal.Rptr.2d 286], a contractor hired to build tenant improvements did not receive timely payment from a financially strapped developer, and because of the contractor's rising receivables, its surety reduced its bonding capacity. Before the surety's action, the contractor had submitted the low bid on a public school construction project. Instead of awarding the contract to that contractor, the school district rebid the project. The contractor prepared a rebid, but could not submit its rebid because it lacked the requisite bonding capacity. Its rebid was lower than the winning bid for the school project. The contractor sued the developer's lender for fraud, seeking damages of $140,588 for profits it did not earn on the school project, amounting to 5 per cent of its rebid. The Court of Appeal affirmed nonsuit for the lender on the lost profits damages, noting there was "no evidence which would have enabled the jury to conclude it was reasonably probable" the contractor "would in fact have earned a profit" in the claimed amount. (*Id.* at p. 536.) Although the contractor "was only obliged to demonstrate its loss with reasonable certainty" (*id.* at pp. 537–538), the court said that the contractor had failed to show that it would be "impossible or impracticable to produce evidence relating to the accuracy of its bid, its ability to competently and efficiently perform the [school] project, or its likely net profit." (*Id.* at p. 538.)

In contrast to *S.C. Anderson*, where the lost profits claim was for a sum certain and flowing from a particular project that the contractor would likely have won as the low bidder, the lost profits Lewis Jorge claimed it would have made on future construction projects were uncertain and speculative.

At trial, Lewis Jorge presented evidence that its bonding capacity was reduced by its surety after the District's termination of the contract. But Lewis Jorge did not establish that when the contract was formed the District could have reasonably contemplated that its breach of the contract would probably lead to a reduction of Lewis Jorge's bonding capacity by its surety, which in turn would adversely affect Lewis Jorge's ability to obtain future contracts. As the evidence at trial disclosed, Lewis Jorge's bonding agent, who had obtained the construction bonds from CNA, anticipated that CNA's suspension of Lewis Jorge's bonding capacity would only be temporary. "Damages may be awarded for breach of contract for those losses which naturally arise from the breach, or which might reasonably have been foreseen by the parties at the time they contracted, as the probable result of the breach." (*Burnett & Doty Development Co. v. Phillips, supra,* 84 Cal.App.3d at p. 389.) But the breaching party "is not required to compensate the injured party for injuries that it had no reason to foresee as the probable result of its breach when it made the contract." (*Ibid.*; See *Coughlin v. Blair* (1953) 41 Cal.2d 587, 603 [262 P.2d 305].)

Evidence at trial established that the owner's terminating a contract might or might not cause the contractor's surety to reduce its bonding capacity. As the District pointed out at oral argument, when it signed the contract it did not know what Lewis Jorge's balance sheet showed or what criteria Lewis Jorge's surety ordinarily used to evaluate a contractor's bonding limits. Absent such knowledge, the profits Lewis Jorge claimed it would have made on future, unawarded contracts were not actually foreseen nor reasonably foreseeable. Hence they are unavailable as special damages for the breach of this contract.

To summarize: It is indisputable that the District's termination of the school construction contract was the first event in a series of misfortunes that culminated in Lewis Jorge's closing down its construction business. Such disastrous consequences, however, are not the natural and necessary result of the breach of every construction contract involving bonding. Therefore, as we concluded earlier, lost profits are not general damages here. Nor were they actually foreseen or foreseeable as reasonably probable to result from the District's breach. Thus, they are not special damages in this case.

DISPOSITION

The judgment of the Court of Appeal must be modified to read: "The judgment against Christopher Butler is reversed; the award of prejudgment interest is reversed; the award of attorney fees is reversed; and the award of $3,148,197 for lost profits is reversed. In all other respects, the judgment is affirmed. The matter is remanded to the trial court for an award of prejudgment interest consistent with the opinion of the Court of Appeal." As modified that judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Respondent's petition for a rehearing was denied February 16, 2005.